IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDWIN ESTIEN, JR.,** | : | **Civil No. 1:13-CV-02474** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Judge Sylvia H. Rambo)** |
| | : | |
| | : | |
| **MARY LOU SHOWALTER, et al.,** | : | |
| | : | |
| **Defendants** | : | |

# <u>M E M O R A N D U M</u>

On September 30, 2013, Plaintiff Edwin Estien, an inmate currently

incarcerated at the State Correctional Institution at Smithfield in Huntingdon,

Pennsylvania ("SCI-Smithfield"), commenced this civil rights action with a

complaint filed pursuant to the provisions of 42 U.S.C. § 1983. (Doc. 1.) In the

complaint, Plaintiff alleges that Defendants, past and present employees

("Corrections Defendants") of his former place of incarceration, the State

Correctional Institution in Huntingdon, Pennsylvania ("SCI-Huntingdon"), as well

as medical staff employed at SCI-Huntingdon ("Medical Defendants"),[1] were

deliberately indifferent to his serious medical needs with respect to care for injuries

to his left hand and thumb. Plaintiff also raises allegations of retaliation,

conspiracy, and related state law claims.

---

[1] The remaining Corrections Defendants are former Corrections Health Care Administrator
("CHCA") Showalter, and RHU Lieutenant Dunkle. The remaining Medical Defendant is
Clinical Coordinator Tracey Parkes.

Presently before the court are two motions for summary judgment, filed by both sets of Defendants, (Docs. 107 & 113), as well as a motion for cross summary judgment filed by Plaintiff, (Doc. 122). For the reasons set forth below, the motions for summary judgment filed by Defendants will be granted and Plaintiff's motion for cross summary judgment will be denied.

## I. Background

### A. Facts

The following facts are related to Plaintiff's claims. The court notes any factual disputes between the parties by presenting all parties' contentions.[2]

#### 1. Facts Regarding Defendants

Plaintiff was incarcerated at SCI-Huntingdon from October 18, 2012 through September 25, 2012. (Doc. 115 ¶ 1; Doc. 125 ¶ 1.) The claims in Plaintiff's complaint arise from an April 17, 2012 altercation he had with another inmate that resulted in a broken left thumb and deep cut from a razor blade. (Doc. 1 ¶ 1.) At all times relevant, Corrections Defendants Showalter and Dunkle were employed by the Pennsylvania Department of Corrections ("DOC") at SCI-

---

[2] In support, Plaintiff has submitted a declaration (Doc. 125-1) and other supporting documents. In addition, Corrections Defendants have submitted the deposition transcript of Plaintiff, dated August 12, 2015, and supporting exhibits (Doc. 116), as well as declarations of Defendants Dunkle and Showalter, Amanda West, a DOC grievance review officer (Doc. 117), and Paula Price, SCI-Huntingdon's current CHCA (Doc. 118). Defendant Parkes has submitted a declaration and supporting documents also. (Doc. 108.)

Huntingdon.  (Doc. 115 ¶ 2.)  Medical Defendant Parkes worked at SCI-Huntingdon, but was employed by Corizon Health Care, Inc.  (*Id*.)

Defendant Dunkle serves as a Corrections Officer 3 or Lieutenant at SCI-Huntingdon, a position he has held since 2011.  (*Id*. ¶ 46.)  At the relevant time, Defendant Dunkle worked in the RHU, or "G" Unit.  (*Id*. ¶ 47.)  The RHU houses inmates who are in disciplinary or administrative custody, and these inmates have limited privileges and activities outside their cells.  (*Id*.)  Defendant Dunkle was the RHU Relief Lieutenant from January 2011 through December 2011, and the Lieutenant from January 2012 through December 2012.  (*Id*.)  As the RHU Lieutenant, Defendant Dunkle was responsible for the supervision of the Corrections Officers in the RHU as well as the inmates in the Unit.  (*Id*.)  The RHU Sergeants reported to Defendant Dunkle, and he, in turn, reported to the Shift Commander.  (*Id*. ¶ 48.)

Generally, when an inmate is sent to the RHU, he is initially strip searched by staff in a metal enclosure.  (*Id*. ¶ 50.)  The strip search is videotaped.  (*Id*.)  An incoming inmate is asked a series of questions from the Suicide Risk Indicators Checklist, which is completed by the RHU staff person.  (*Id*.)  A nurse is also present and examines the inmate.  (*Id*.)  In addition, the nurse also completes the Suicide Risk Indicators Checklist.  (*Id*.)

When an injured inmate enters the RHU, he is seen by medical staff. (*Id.* ¶ 49.) If the injury is the result of an altercation and security staff had intervened to separate the inmates, medical staff takes photographs of the inmate and any injuries. (*Id.*) However, if security staff is not involved in separating inmates involved in an altercation, RHU security staff takes the photographs of the inmate and any injuries. (*Id.*) In his role as RHU Lieutenant, Defendant Dunkle does not provide medical care to inmates in the RHU, nor is he responsible for what medical care and treatment an inmate is to receive and when they are to receive it. (*Id.*) Rather, the nurses and other medical staff make daily rounds in the RHU, or inmates may fill out sick call request slips, if necessary. (*Id.*)

Turning to Defendant Showalter, at the relevant time, she was serving as SCI-Huntingdon's Corrections Health Care Administrator ("CHCA"). (*Id.* ¶ 2.) Prior to her promotion to CHCA, Defendant Showalter held the positions of Registered Nurse ("RN") and RN Supervisor at SCI-Huntingdon. (*Id.* ¶ 30.) As an RN, Defendant Showalter cannot prescribe medication, including painkillers. (*Id.* ¶ 31.)

As the CHCA at SCI-Huntingdon, Defendant Showalter's duties included the following: planning, organizing, directing and managing the health care services program, the coordination of a professional medical staff in cooperation with a contracted medical vendor, and compliance monitoring and supervision of

contracted medical services.  (*Id.* ¶ 32.)  She reported to the Deputy Superintendent for Centralized Services.  (*Id.*)

In addition, Defendant Showalter answered inmate grievances and request slips from inmates regarding their medical treatment.  (*Id.* ¶ 33.)  The Superintendent's Assistant at SCI-Huntingdon would assign an inmate grievance to her.  (*Id.*)  In order to respond to an inmate grievance or request slip, Defendant Showalter normally would review the inmate's medical records.  (*Id.*)  If an inmate grievance or request slip concerned a consultation with an outside doctor, Defendant Showalter would also normally contact the contracted medical vendor, who, at the relevant time, was Corizon Health Care, Inc.  (*Id.*)

After an inmate was taken to a local Emergency Room, any instructions from the ER doctor would have been sent to Corizon, and not to Defendant Showalter.  (*Id.* ¶ 34.)  If Corizon initiated or scheduled a consultation, Defendant Showalter would monitor such consultations.  (*Id.*)  However, she would not have been aware of any consultations not initiated or scheduled by Corizon.  (*Id.*)

Under SCI-Huntingdon's contract with Corizon, the medical vendor had thirty (30) days to complete an inside consultation and sixty (60) days to complete an outside consultation.  (*Id.* ¶ 35.)  However, if surgery was necessary, normally it would be scheduled earlier than thirty (30) or sixty (60) days.  (*Id.*)  At the relevant time, the Site Administrator for Corizon was Defendant Parkes.  (*Id.*)  Her duties

5

included scheduling outside consultations and surgeries. (*Id*.) Defendant Showalter did not order outside consultations or surgeries. (*Id*.) Further, as the CHCA, she could not override decisions of medical doctors, such as what medications to prescribe or whether to order outside consultations or physical therapy. (*Id*. ¶ 36.)

As to medical treatment of an inmate in the RHU, Defendant Showalter provided that, if an inmate was issued a health care item such as a brace or splint, the RHU staff would sometimes deny the item to the inmate for security reasons. (*Id*. ¶ 37.) Further, nurses and other medical staff made daily rounds in the RHU. (*Id*.) If an inmate had complaints about his health or treatment, he could complain to the nurses and other medical staff monitoring the RHU, or he could submit a sick call slip. (*Id*.)

Turning to Medical Defendant Parkes, she currently holds the position of Health Services Administrator at SCI-Huntingdon, but formerly held the position of clinical coordinator from April 2012 through May 2012. (Doc. 108 ¶ 1.) In her position as clinical coordinator, Defendant Parkes did not provide medical care to inmates, and indeed, had no personal contact with Plaintiff for the provision of medical services. (*Id*. ¶¶ 2, 3.) Rather, her duties included scheduling appointments with outside medical professionals when directed to do so by a health care professional at the prison. (*Id*. ¶ 5.) To that end, it is the prison's

medical personnel who determine the reason for an inmate to be transferred to an outside medical provider.  (*Id*. ¶ 12.)

Further, Defendant Parkes had no control over when an inmate will be seen by a medical provider outside the prison facility.  (*Id*. ¶ 4.)  The date of an appointment is determined by the outside medical provider based upon availability.  (*Id*. ¶ 6.)  Once an appointment date is secured, prison officials are notified through the distribution of a "trip sheet" so that arrangements can be made to transport the inmate to the location of the outside medical provider.  (*Id*. ¶ 7.)  Defendant Parkes did not control the availability of prison officials to transport an inmate to a scheduled appointment.  (*Id*. ¶ 9.)

As to the duties of both Defendants Showalter and Parkes, Plaintiff counters that, as clinical coordinators, both Defendants had knowledge of Plaintiff's injuries after the April 17, 2012 altercation, yet "did nothing" to have him immediately seen by a nurse, doctor, or physician's assistant, nor did they make arrangements to take him to a hospital.  (Doc. 125, Part II, ¶ 1.)[3]  In addition, he asserts that, after a second appointment with an outside doctor was made for April 23, 2012, both Defendants knew of this appointment and "did nothing" to have Plaintiff returned to the hospital on that day for "emergency surgery."  (*Id*., Part I, ¶ 10.)  More specifically, Plaintiff asserts that "it was [Defendant Parkes']

---

[3] Plaintiff has submitted a two-part counter statement of material facts.  (*See* Doc. 125.)  As both parts are docketed under Document 125, the court will differentiate by noting Part I or Part II.

job duty to arrange an escort team" to have Plaintiff taken to that appointment. (*Id.*, Part I, ¶ 11.) Defendant Parkes denies that this was her job duty. (Doc. 129 ¶ 11.) Notably, however, at his deposition Plaintiff admits that the April 23, 2012 appointment was not, in fact, with a surgeon but, rather, with Dr. Stauff, who would not conduct surgery on Plaintiff's hand. (Doc. 116 at 79-80.) And finally, Plaintiff asserts that both of these Defendants knew of the razor blade in his left thumb and the need for a second surgery to remove the blade, but "did nothing" to have him taken back to an outside doctor to be seen. (Doc. 125, Part II, ¶¶ 6, 7.)

### 2. **Facts Regarding Plaintiff's Injuries and Subsequent Requests for Care**

On April 17, 2012, Plaintiff and an inmate Jones were involved in a fight in the yard of "C" Unit. (Doc. 115 ¶ 52.) Plaintiff contends that Jones instigated the fight, claiming that Jones came up behind him and tried to cut him with a razor blade. (*Id.* ¶ 5.) Plaintiff punched Jones in return, causing the break to his left thumb and wrist. (*Id.*) In addition, Plaintiff, who is left-handed, was cut on his left thumb with the razor blade. (*Id.*) Although his hand was bleeding, after the fight Plaintiff returned to the field in the yard to watch a ballgame. (*Id.*) Corrections Officers thereafter approached him on the bleachers and took him directly to the RHU. (*Id.*) None of the Defendants were present for the fight. (*See* Docs. 108, 115, 125.)

Upon Plaintiff's arrival at the RHU, Defendant Dunkle processed his entry into the unit.[4] (Doc. 115 ¶¶ 6, 52.) Defendant Dunkle noted the injuries to Plaintiff's left thumb, and took photographs of his hand. (*Id*. ¶¶ 6, 52.) He also informed Plaintiff that medical staff would examine him in the RHU. (*Id*. ¶ 52.) Plaintiff counters that Defendant Dunkle told him that he would not get him medical assistance, and that he should "sit in [his] cell and think about what [he] did because the inmate that [he] was fighting was one of his informants and the pain [he's] in should teach [him] a lesson." (Doc. 1 at 3.) Defendant Dunkle denies making these assertions. (Doc. 115 ¶¶ 55, 56.)

Also present in the RHU on April 17, 2012 was LPN Melanie Wagman. (*Id*. ¶ 53.) Nurse Wagman examined Plaintiff and completed the bottom part of the Suicide Risk Indicators Checklist, signing it at 8:30 p.m. (*Id*.; Doc. 117 at 66.) Defendant Dunkle completed the top part of the Checklist. (Doc. 115 ¶ 53; Doc. 117 at 66.) In addition, Nurse Wagman entered a note in Plaintiff's medical record stating, "No injuries noted or voiced. [Plaintiff] stated, 'I'm ok.' P[rescribe]: sick call as needed." (Doc. 115 ¶61; Doc. 118 at 61.) In addition, Plaintiff's medical chart from the intake was reviewed by an RN Grassmyer. (Doc. 115 ¶ 61; Doc. 118 at 61.) Plaintiff denies that Nurse Wagman was present for the intake itself,

---

[4] As a result of the fight, Plaintiff was issued a misconduct for which he pleaded guilty and received forty-five (45) days in the RHU. (Doc. 115 ¶ 6.) Defendant Dunkle denies telling Plaintiff that he was not leaving the RHU and ordering Corrections Officers to issue misconducts to him in order to keep him in the RHU. (*Id*. ¶ 55.)

countering that only Defendant Dunkle and two other Corrections Officers were there.  (Doc. 125, Part II, ¶ 3.)

Two days later, on April 19, 2012, Plaintiff was seen in the RHU during sick call by a Dr. Dayan.  (Doc. 115 ¶ 62.)  Dr. Dayan ordered x-rays of Plaintiff's left thumb and prescribed Tylenol.  (*Id*.; Doc. 118 at 79.)  Plaintiff denies that he was seen on April 19, 2012.  (Doc. 125, Part II, ¶ 3.)  Rather, Plaintiff claims that he was not seen by medical personnel until April 20, 2012.  (*Id*.)

On April 20, 2012, Dr. Dayan noted that the x-ray revealed a fracture of the first metacarpal bone at the base of Plaintiff's left thumb, and ordered Plaintiff be transported to the Altoona Regional Medical Center Emergency Room for an orthopedic consult.  (Doc. 115 ¶ 62; Doc. 118 at 78.)  That same day, April 20, 2012, Plaintiff was transported to the Emergency Room and had his left thumb x-rayed.  (Doc. 115 ¶ 63; Doc. 118 at 83-88.)  The x-ray revealed a fracture at the base of the left first metacarpal bone and "a metallic radiopaque soft tissue foreign body which is identified in the soft tissues at the level of the distal phalanx of the left thumb.  This has the shape of an arrow." [5]  (Doc. 115 ¶ 63; Doc. 118 at 86.)  The Altoona Regional Emergency Record set forth in the record notes the following medical providers from that visit: ED Attending Jessica Shepherd,

---

[5] The radiology consultation report originally noted on April 20, 2012, "Normal appearing left thumb.  No evidence for radiopaque soft tissue foreign body," (Doc. 118 at 87), but was corrected by way of addendum on April 22, 2012, (*id*. at 86).

Primary RN Shirley Huber, and Ordering Doctor Christopher Holland. (Doc. 118 at 83-88.) In addition, the Radiology Consultation was electronically signed by a Dr. Richard A Wertz. (*Id*. at 87-88.)

Plaintiff was returned to SCI-Huntingdon the same day with a splint secured with two ace wraps and stitches in his left thumb. (Doc. 115 ¶ 63.) He was approved to have the splint and ace wraps in the RHU. (*Id*.)

The next day, April 21, 2012, Plaintiff saw a physician's assistant ("PA") in the RHU and told him that his hand hurts. (*Id*. ¶ 64.) An orthopedic consultation was submitted. (*Id*.) On April 24, 2012, Plaintiff complained to a nurse in the RHU that his left hand was painful and he was having difficulty sleeping due to the pain. (*Id*.) The nurse noted that his partial cast and ace wraps were intact, but would ask the doctor about pain medication. (*Id*.) On that same day, during the RHU pill line, Dr. Dayan saw Plaintiff and prescribed Tylenol #3 (Tylenol with codeine) for his pain. (*Id*.) The next day, April 25, 2012, Plaintiff was not seen, but a Dr. Agra noted in his chart an "abnormal x-ray report" and recommended a follow-up by a doctor or PA the next week. (*Id*.)

On April 29, 2012, Plaintiff was seen by a nurse in the RHU and had his left hand checked. (*Id*. ¶ 65.) The nurse noted that Plaintiff's splint was in place and that his fingers were warm and dry. (*Id*.) On April 30, 2012, Dr. Araneda saw Plaintiff, who had complaints of swelling and pain in his left thumb. (*Id*.) The

doctor noted pain on manipulation of the left thumb and a puncture wound on the distal phalanx of the left thumb. (*Id.*; Doc. 118 at 57.) He also noted that Plaintiff had an orthopedic appointment scheduled. (Doc. 115 ¶ 65.) Dr. Araneda made a note on May 1, 2012 that Plaintiff was scheduled for "MD line," and seen on April 30, 2012. (*Id.*)

On May 3, 2012, in Plaintiff's chart Dr. Araneda added a late entry as an addendum to an April 22, 2012 note making reference to Plaintiff's x-ray report. (*Id.* ¶ 66.) On the same day, May 3, 2012, a Nurse Hoffmaster saw Plaintiff in the RHU and he complained that "it feels like that piece of metal in my thumb is coming out. I can feel it jagging." (*Id.*) The nurse noted that the ace wraps were still in place, and movement to Plaintiff's fingers and thumb was stationary due to the half cast. (Doc. 118 at 57.) She also placed Plaintiff on the "MD line" for follow-up on the foreign body in his left thumb on May 4, 2012 in the medical department. (Doc. 115 ¶ 66; Doc. 118 at 57.) On May 4, 2012, Dr. Araneda evaluated Plaintiff, noting that he was scheduled for removal of the foreign body from his left thumb, and that he had a full splint on the thumb that looked clean. (Doc. 115 ¶ 66.) Plaintiff complained of pain. (*Id.*) He was prescribed Tylenol-3 for three (3) days. (Doc. 118 at 77.)

On May 9, 2012, Plaintiff was seen in the RHU by a PA, who noted that Plaintiff complained of continued pain in his left thumb. (Doc. 115 ¶ 67.) The PA

also noted that an orthopedic consultation was pending. (*Id*.) Further, Plaintiff was prescribed Tylenol-3 for five (5) days. (Doc. 118 at 77.)

On May 10, 2012, Plaintiff was taken to an outside appointment with a Michael Stauff, M.D., of the University Orthopedics Center in State College. (Doc. 115 ¶ 67.) In his report, Dr. Stauff noted the following specifics regarding Plaintiff's left thumb injury:

> The pain is aching and sharp. . . . The pain is aggravated by bending and movement. The pain is relieved by brace/splint and rest. Associated symptoms include decreased mobility, swelling and tingling in the arms. Pertinent negatives include bruising, crepitus, difficulty going to sleep, instability, limping, locking, night pain, night-time awakening, numbness, popping, spasms, tingling in the legs, tenderness or weakness. Additional information: [Plaintiff] here for left thumb injury. [Plaintiff] is an inmate and was not taken to the ER until 4 days later.
>
> * * *
>
> This is his first [appointment] since his ER visit. He has pain, but it is improved. He is left handed. Xrays of the [left] hand show a [displaced] Bennett fracture.

(Doc. 118 at 107.) Dr. Stauff also noted that he would refer Plaintiff to a hand surgeon that same day. (*Id*. at 108.)

In Plaintiff's counter statement of material facts, he asserts that he first saw Dr. Stauff at the Altoona Regional Hospital on April 20, 2012. (Doc. 125, Part I, ¶ 9; *see also* Doc. 116 at 29.) He also asserts that Dr. Stauff wrote a note to Defendant Parkes that day directing her to make arrangements for him to return to

the hospital the following Monday, April 23, 2012, for "emergency surgery." (Doc. 125 ¶ 9.) He asserts that neither Defendant Parkes nor Defendant Showalter followed through with those arrangements. (*Id*. ¶ 10.)

As stated above, however, the record reflects that Plaintiff initially saw Dr. Stauff at the University Orthopedics Center in State College on May 10, 2012. Plaintiff was evaluated by a hand surgeon, a Christopher J. Lincoski, M.D., that afternoon, May 10, 2012. (Doc. 115 ¶ 67.) Dr. Lincoski noted that Plaintiff's left thumb required surgery, specifically an "open reduction and internal fixation given that this fracture is a few weeks old." (Doc. 118 at 109.) He scheduled the surgery for the following day. (*Id*.) Further, the medical paperwork from the evaluations was forwarded to Corizon. (Doc. 115 ¶ 67; Doc. 118 at 55.)

On May 11, 2012, Dr. Lincoski performed surgery on Plaintiff's left thumb at the University Orthopedic Center. (Doc. 115 ¶ 67; Doc. 118 at 110-12.) The preoperative and postoperative diagnoses were "left Rolando fracture." (Doc. 115 ¶ 67; Doc. 118 at 110.) Dr. Lincoski proceeded with an open reduction in order to repair the thumb using the Wagner approach, a method that uses screws and wires to secure the repaired fracture. (Doc. 118 at 110-12.) After the surgery, Plaintiff's thumb was placed in a splint and he was sent to recovery. (*Id*. at 111.) Upon his discharge, Plaintiff was prescribed Percocet. (*Id*. at 144.) Rather than

being returned to SCI-Huntingdon, Plaintiff was placed in a medical observation cell at SCI-Smithfield. (Doc. 115 ¶ 67.)

Also on May 11, 2012, Plaintiff complained of pain, and was prescribed Vicodin. (*Id*. ¶ 68; Doc. 118 at 50.) A nurse noted that the bandage to his left hand and arm was intact. (Doc. 115 ¶ 68; Doc. 118 at 50.) On May 12, 2012, Plaintiff demanded more pain medication, but the nurse denied the request because it was not yet time for distribution of more pain medication. (Doc. 115 ¶ 68; Doc. 118 at 51.) The physician's notes indicate that, at that time, Plaintiff was prescribed Tylenol-3, Percocet, Vicodin, and Motrin. (Doc. 118 at 75.) Later that day, Plaintiff was discharged from the medical observation cell and returned to SCI-Huntingdon. (Doc. 115 ¶ 68; Doc. 118 at 51.) Upon his return, Plaintiff's current pain medications (Percocet and Vicodin) were discontinued and Tylenol-3 was prescribed, as per Dr. Long. (Doc. 115 ¶ 68; Doc. 118 at 51, 75.)

On May 14, 2012, Dr. Dayan noted that "hand surgery follow-up consult submitted in 10-14 days." (Doc. 115 ¶ 69.) The next day, Dr. Dayan evaluated Plaintiff at RHU sick call. (*Id*.) Plaintiff complained of pain in his left hand, and Dr. Dayan prescribed Motrin. (*Id*.; Doc. 118 at 74.) On May 19, 2012, Plaintiff complained to a nurse about left hand pain. (Doc. 115 ¶ 69.) The nurse instructed him to continue the Motrin and to elevate his hand as directed. (*Id*.) On May 20,

2012, Plaintiff was seen again by a PA for complaints of pain in his left arm and hand. (*Id*.) He was prescribed Motrin for thirty (30) days. (Doc. 118 at 74.)

On May 22 and 25, 2012, Dr. Dayan evaluated Plaintiff at the RHU sick call for complaints relating to the placement of his cast. (Doc. 115 ¶ 69; Doc. 118 at 46.) Dr. Dayan did not note any problems, and continued the Motrin. (Doc. 118 at 46.)

On May 26, 2012, Plaintiff was seen twice by Nurse Hoffmaster. (Doc. 115 ¶ 69; Doc. 118 at 46-47.) During the first visit, Plaintiff complained of pain in his left hand, a tingling sensation, and difficulty sleeping at times due to the pain. (Doc. 115 ¶ 69.) The nurse instructed him to sign up for sick call regarding his pain medication. (*Id*.) Later that same day, Nurse Hoffmaster saw Plaintiff after he stated he fell off his bunk and landed on his right hand. (*Id*.; Doc. 118 at 47.) He told her that the outside of his lower left arm also hit the bunk. (Doc. 118 at 47.) She checked his hand and fingers, and he told her that Motrin was not helping with the pain. (*Id*.) The nurse placed Plaintiff on the urgent care list for the following day and instructed him to continue taking the Motrin and keep his hand elevated. (*Id*.) Plaintiff also complained about not yet having an appointment to remove his cast. (*Id*.) The nurse explained to him that the consultation had been written, but the scheduling of the appointment and transportation arrangements take time. (*Id*.)

On May 27, 2012, Plaintiff was evaluated by a PA in the RHU. (Doc. 115 ¶ 70.) He told the PA he fell and hit his left arm and back. (*Id.*) He also wanted to know when he was scheduled to return to the orthopedic surgeon to get the cast off. (*Id.*) The PA noted: "No change in needs of treatment, await follow-up with ortho." (*Id.*; Doc. 118 at 44.)

On May 29, 2012, Plaintiff was seen by Dr. Dayan at the RHU sick call, where he complained of discomfort in his left hand. (Doc. 115 ¶ 71.) Dr. Dayan checked his hand, discontinued Motrin and prescribed Tylenol 500 mg. (*Id.*) Later that day, Plaintiff told a nurse that his arm was hurting and that no one had brought him the Tylenol. (*Id.*) The nurse then gave Plaintiff the Tylenol as per the order, and instructed him to alert nursing if the pain got worse or, in the alternative, go to sick call. (Doc. 118 at 44.) The nurse noted that Plaintiff verified his understanding. (*Id.*)

On May 31, 2012, Plaintiff had an outside consultation with Dr. Lincoski, the hand surgeon. (Doc. 115 ¶ 71; Doc. 118 at 45, 136.) The doctor noted that the fracture of the first metacarpal bone was healing well and that follow-up within two (2) weeks was needed for pin removal. (Doc. 115 ¶ 71; Doc. 118 at 136.) When Plaintiff returned to SCI-Huntingdon that same day, his cast was re-applied to his left hand/wrist area. (Doc. 115 ¶ 71; Doc. 118 at 45.) It was inspected by security, who noted that nothing on the cast can be removed. (Doc.

115 ¶ 71; Doc. 118 at 45.)  Plaintiff's chart was forwarded to Corizon's Medical Director for review.  (Doc. 115 ¶ 71; Doc. 118 at 45.)

On June 8, 2012, Plaintiff saw a nurse practitioner, complaining of hand pain.  (Doc. 115 ¶ 72.)  She prescribed Tylenol 500 mg for fourteen (14) days. (*Id*.; Doc. 118 at 73.)  On June 11, 2012, Plaintiff was evaluated by Dr. Araneda for complaints of pain in his left hand.  (Doc. 115 ¶ 72; Doc. 118 at 42.)  The doctor noted that the skin of Plaintiff's left hand and fingers looked normal, and that there was no swelling or discoloration.  (Doc. 115 ¶ 72.)  He also noted that Plaintiff was scheduled to have the cast on for another month.  (*Id*.)  He also prescribed Motrin 400 mg.  (*Id*.; Doc. 118 at 72.)  On June 13, 2012, Plaintiff was seen again at RHU sick call for continued pain in his left hand.  (Doc. 115 ¶ 72; Doc. 118 at 42.)  He complained that his cold cell made the pain worse.  (Doc. 118 at 42.)  The PA advised Plaintiff to take the Motrin as ordered and to wrap his hand in a blanket if his cell got cold.  (*Id*.)

On June 15, 2012, Plaintiff was again seen by Dr. Araneda, who noted that Plaintiff's fingers had normal color, normal temperature, and normal motion. (Doc. 115 ¶ 73.)  The doctor noted: "In spite [of] his complaints [of] consistent pain on left hand, his left hand and casting looks OK to me.  Continue monitoring." (Doc. 118 at 43.)  On June 20, 2012, Paul Noel, Corizon's Medical Director,

ordered an orthopedic consultation within six (6) weeks.  (Doc. 115 ¶ 73; Doc. 118 at 43, 72.)

On June 22, 2012, Plaintiff was evaluated again by Dr. Araneda.  (Doc. 115 ¶ 73.)  The doctor noted pain and swelling in Plaintiff's left thumb and ordered x-rays.  (*Id*.; Doc. 118 at 40, 72.)  Upon his review of the x-rays later that same day, Dr. Araneda noted that the nail base of the left thumb was healing well.  (Doc. 115 ¶ 73; Doc. 118 at 40.)  The x-ray report also noted a "persistent 7 mm metallic foreign body over left 1st distal phalanx."  (Doc. 118 at 160.)  A splint was applied and the doctor recommended continued monitoring.  (Doc. 115 ¶ 73.)

On June 25, 2012, a nurse noted that Plaintiff had been issued Motrin on June 11, 2012, so she would instruct him to "take all."  (*Id*.; Doc. 118 at 40.)  Plaintiff was also seen at sick call on June 26, 2012 for complaints of chest pain, and was instructed to continue the Motrin.  (Doc. 118 at 39, 40.)

In the evening of June 28, 2012, Plaintiff was seen by a nurse for complaints that his tape and splint were causing a rash/itching throughout the night.  (Doc. 115 ¶ 74.)  It was very uncomfortable for him.  (*Id*.)  The nurse noted that he had a consult in four (4) weeks, but would have Dr. Araneda check on him in the morning.  (*Id*.)  On the next day, June 29, 2012, Dr. Araneda evaluated Plaintiff, noting that his thumb looked okay, but Plaintiff was not happy with the splint.  (*Id*.)  The doctor noted the need for an orthopedic follow-up.  (*Id*.)

On July 2, 2012, Plaintiff was evaluated by Dr. Araneda for complaints of pain and swelling in his left thumb. (*Id.* ¶ 75.) The doctor noted that a follow-up consultation was pending. (*Id.*) On July 3, 2012, Dr. Araneda noted his review of Plaintiff's latest x-rays. (*Id.*)

On July 6, 2012, Dr. Araneda noted that Plaintiff was going to physical therapy for his left hand, but that Plaintiff had no complaints that morning. (*Id.*) On that same day, Plaintiff was seen at HealthSouth for occupational therapy. (*Id.*; Doc. 118 at 129-31.) He presented with chief complaints of pain and lack of strength in his left hand. (Doc. 118 at 131.) The therapist noted a slight edema on his left thumb. (*Id.*) A brace/thumb split was ordered for six (6) months. (Doc. 115 ¶ 75; Doc. 118 at 94.) Plaintiff signed a health care item receipt for this splint. (Doc. 118 at 94.) Three days later, on July 9, 2012, Dr. Araneda referred Plaintiff again for physical therapy, noting that a consultation had been written. (Doc. 115 ¶ 75; Doc. 118 at 71.)

On July 17, 2012, Plaintiff was evaluated by Dr. Araneda for complaints of stiffness, pain, and muscle weakness in his left hand, especially in his left thumb. (Doc. 115 ¶ 75; Doc. 118 at 35.) The doctor noted that the function in Plaintiff's left hand "seems to be OK to me." (Doc. 118 at 35.) In addition, the doctor noted that Plaintiff wanted to see an orthopedic doctor, but Dr. Araneda responded, "I think he doesn't need ortho, he might need PT." (*Id.*)

On July 23 and 24, 2012, Plaintiff was not in his cell during sick call, so did not see Dr. Araneda. (Doc. 115 ¶ 76.) On July 24, 2012, Dr. Araneda ordered another x-ray of Plaintiff's left hand. (*Id.*; Doc. 118 at 71.) On July 26, 2012, Plaintiff had an outside follow-up consultation with Dr. Lincoski, who noted that the fracture had healed. (Doc. 115 ¶ 76; Doc. 118 at 132.) He recommended discontinuation of physical therapy and Plaintiff's brace. (Doc. 118 at 132.) He also advised activity as tolerated. (*Id.*) Plaintiff's medical chart was sent to Corizon on the same day for review. (Doc. 118 at 36.) Further, in a consultation record signed by Dr. Araneda on July 31, 2012, it appears that, per the recommendation of Dr. Lincoski, Dr. Araneda cancelled a physical therapy consultation scheduled for July 30, 2012 at 9:00 a.m. (*Id.* at 128.)

On August 1, 2012, a Dr. Cole noted that an undated radiology report indicated a "stable" fracture. (Doc. 115 ¶ 77; Doc. 118 at 33.) On August 2, 2012, Plaintiff was seen in the RHU for complaints of continued pain in his left thumb. (Doc. 115 ¶ 77; Doc. 118 at 33.) He told the PA that a piece of razor blade in his left hand was "trying to get out." (Doc. 118 at 33.) The PA noted that Plaintiff could not be escorted to a treatment room that day, but ordered that he be taken to one the following week for PA/MD line to evaluate his hand. (Doc. 118 at 33, 70.)

On August 8, 2012, Plaintiff was evaluated by another PA in the RHU. (Doc. 115 ¶ 77; Doc. 118 at 33.) Plaintiff told the PA that he still has a razor blade

in his left thumb and that he was supposed to have a follow-up at Altoona Hospital to remove the blade. (Doc. 118 at 33.) Upon examination, the PA did note the presence of the razor blade in Plaintiff's left thumb, and ordered that Plaintiff be scheduled for the MD line to discuss the blade's removal. (*Id*. at 33, 70.) Dr. Cole saw Plaintiff on the following day, August 9, 2012, noted Plaintiff's pain in his left thumb, and referred him to a hand surgeon for further evaluation. (Doc. 118 at 34, 70.)

On August 14, 2012, Plaintiff was evaluated by a PA in the RHU for his continued pain in his left thumb. (Doc. 115 ¶ 78; Doc. 118 at 34.) The PA noted a stable proximal metacarpal fracture in his thumb, as well as the presence of a foreign body. (Doc. 118 at 34.) She noted that a referral for a hand surgeon had already been placed and prescribed Motrin. (*Id*.)

Plaintiff was in the yard for sick call on August 21, 2012, but a PA did evaluate him in the RHU on August 22, 2012. (Doc. 118 at 31.) Plaintiff complained of continued pain in his left thumb and told the PA that the "screws are coming out." (Doc. 115 ¶ 78; Doc. 118 at 31.) The PA continued the Motrin and Tylenol for Plaintiff's pain and noted that a hand surgeon consultation was pending. (Doc. 115 ¶ 78; Doc. 118 at 31.)

On August 23, 2012, Plaintiff had an outside consultation with Dr. Lincoski, the hand surgeon. (Doc. 115 ¶ 78; Doc. 118 at 127.) Dr. Lincoski noted

the foreign body in Plaintiff's left thumb tip and recorded that he would remove it via surgery. (Doc. 118 at 127.) Plaintiff was returned to SCI-Huntingdon that same day, and his medical chart was forwarded to Corizon for review. (*Id*. at 31.) On August 24, 2012, Dr. Cole noted Dr. Lincoski's consultation record from the last appointment and placed a new consultation. (*Id*. at 31, 69.)

On August 28, 2012, Plaintiff was seen at sick call in the RHU for complaints of continued pain in his left thumb. (Doc. 115 ¶ 78; Doc. 118 at 32.) The PA noted the foreign body in Plaintiff's left thumb, discontinued the Motrin, and prescribed Relefen. (Doc. 115 ¶ 78; Doc. 118 at 32.) She also noted that a surgery consultation had been submitted. (Doc. 118 at 32; *see also* Doc. 118 at 69.)

On September 1, 2012, Plaintiff was directed to cease taking Motrin, any NSAIDs, or blood thinners, until further notice. (Doc. 118 at 32.) The medical note indicates that Plaintiff agreed. (*Id*.) There is no explanation in the record for this directive.

On September 7, 2012, Plaintiff underwent hand surgery at the University Orthopedic Center for removal of the foreign body from his left thumb. (Doc. 115 ¶ 79; Doc. 118 at 121-26.) Dr. Lincoksi, the surgeon, noted in the consultation record: "Left thumb foreign body removed. May remove dressing in 48 hours. Apply band-aid. Follow-up 10-14 days." (Doc. 118 at 121.) Plaintiff

returned to SCI-Huntingdon that same day and was seen by a PA. (Doc. 115 ¶ 79; Doc. 118 at 32.) The PA noted no complaints from Plaintiff, and observed the dressing was dry and no drainage from the surgical site. (Doc. 118 at 32.) Also on that date, Dr. Araneda ordered an antibiotic, Tylenol-3, and Motrin. (Doc. 118 at 68.) He directed that the dressing be removed in 48 hours and then use band-aids on the site. (*Id.*) He also directed follow-up and suture removal in 10-14 days. (*Id.*)

On September 12, 2012, a nurse removed the dressing from Plaintiff's left thumb. (Doc. 115 ¶ 79.) Plaintiff had no complaints, and there was no drainage, swelling, or redness on the site. (*Id.*; Doc. 118 at 32.) She noted that the sutures were intact, and covered them with band-aids. (Doc. 115 ¶ 79; Doc. 118 at 32.)

On September 17, 2012, Plaintiff had a follow-up appointment with Dr. Lincoski, who noted, "[Foreign body] removed. May benefit from a short course of PT for hand strengthening and ROM [range of motion]. [Follow-up]." (Doc. 115 ¶ 80; Doc. 118 at 120.) On September 20, 2012, Plaintiff was evaluated by a PA for continued pain in his left thumb. (Doc. 115 ¶ 80; Doc. 118 at 119.) The PA wrote a consultation for physical therapy. (Doc. 115 ¶ 80; Doc. 118 at 68, 119.)

On September 25, 2012, Plaintiff was transferred to SCI-Fayette. (Doc. 115 ¶ 80.) He continued to receive medical care at that facility. (*Id.*; *see generally* Doc. 118.)

Turning to Plaintiff's grievances relating to his injuries, the record reflects the following. On April 30, 2012, Plaintiff wrote a request slip to Defendant Showalter, asking her why he had not yet been taken to an outside specialist for his thumb injury. (Doc. 115 ¶ 9; Doc. 116 at 97.) In her response dated the same day, Defendant Showalter stated, "I cannot give you the date but you are scheduled to see [an] orthopedic specialist." (Doc. 116 at 97.)

On May 9, 2012, Plaintiff sent another request slip to Defendant Showalter, complaining about the pain in his hand, asking why he did not have a follow-up appointment with a surgeon, and informing her that his pain medication had been cut. (Doc. 115 ¶ 9; Doc. 116 at 98.) Defendant Showalter's response, dated May 10, 2012, stated only, "You saw the surgeon today." (Doc. 116 at 98.)

On May 16, 2012, Plaintiff sent another request slip to Defendant Showalter, complaining about the pain in his hand after his May 11, 2012 surgery. (Doc. 115 ¶ 11; Doc. 116 at 99.) He stated that, although he was given Tylenol-3 for three (3) days before switching to Motrin on the fourth day, he remained in pain and in need of more pain medication. (Doc. 116 at 99.) Defendant Showalter did not respond to this inmate request slip. (*See id.*)

On May 20, 2012, Plaintiff sent an inmate request slip to Defendant Showalter, asking how long he needed to keep the screws in, and cast on, his hand. (Doc. 117 at 26.) Defendant Parkes responded on May 21, 2012, stating, "I am currently working on your follow-up appointment. You can ask the doctor any questions you may have at that appointment." (*Id.*)

On June 6, 2012, Plaintiff submitted Grievance No. 415418, complaining that Defendant Dunkle had unnecessarily extended his time in the RHU and had denied him medical assistance in the RHU. (Doc. 115 ¶ 13; Doc. 116 at 101-02.) On June 11, 2012, Facility Grievance Coordinator Connie Green rejected the grievance, noting that Plaintiff's complaints had already been addressed through SCI-Huntingdon's inmate discipline/misconduct procedures. (*Id.* at 100.) There is nothing in the record indicating whether Plaintiff appealed this rejection. (*See* Doc. 117 at 35.)

On June 15, 2012, Plaintiff filed Grievance No. 416313, complaining about the treatment he was receiving for his left hand injury. (Doc. 117 at 57.) Specifically, Plaintiff stated that, on June 14, 2012, he jammed his cast in his cell door's food slot, further injuring his hand. (*Id.*) He acknowledged that Dr. Araneda examined him on June 15, 2012, but only looked at his cast and said nothing was wrong with him. (*Id.*) Grievance Coordinator Green noted receipt of

the grievance on June 18, 2012. (*Id*.) On June 19, 2012, Defendant Showalter

denied the grievance, stating,

> Review of your medical record and discussion with Dr. Araneda
> reveals that after he saw you, he discussed this with Corizon Clinical
> Coordinator. You were already scheduled for a follow up
> appointment with the orthopedic specialist on 6/18/12. For security
> reasons you could not be told the day of your off site appointment.
> You were also already receiving Motrin for pain. You have since
> seen the specialist and your cast and pin were removed. This
> grievance is without merit and is denied. You have received
> appropriate medical care.

(*Id*. at 58.) Plaintiff appealed this decision to the Superintendent on June 21, 2012,

noting that "every medical staff is aware of my medical situation and I have appeal

this matter in particular to Ms. Showalter." (*Id*. at 105.) The Superintendent

denied the appeal on July 5, 2012, stating,

> In reviewing your grievance and appeal, I note that your concern with
> your healthcare was appropriately addressed by Ms. Showalter. In
> your appeal, you repeat your claims from your initial grievance, and
> you state Dr. Araneda is incompetent. As Ms. Showalter explains in
> her response to your initial grievance, you were already receiving
> Motrin for the pain, the decision was made to wait for the orthopedic
> specialist to check your hand and cast. The incident you describe
> happened on 6-15-12, a Friday, and you were already scheduled to see
> the specialist on 6-18-12, the Monday after the weekend. I find the
> healthcare provided by Dr. Araneda was reasonable and appropriate.
> In closing, I can only reiterate that I uphold the response provided by
> the grievance officer. Your grievance is found to be without merit.

(*Id*. at 11.) Plaintiff appealed this decision to the DOC Secretary's Office of

Inmate Grievances & Appeals ("SOIGA") on July 23, 2012. (*Id*. at 9.) In his

appeal, Plaintiff again complained that Dr. Araneda was not providing him with

proper medical care for his left hand and thumb injuries. (*Id*.) On August 10, 2012, SOIGA dismissed the appeal on the basis that Plaintiff did not provide the required documentation for proper review. (*Id*. at 8.)

On June 25, 2012, Plaintiff submitted an inmate request to Defendant Showalter, inquiring into the delay in his physical therapy for his left hand and complaining about treatment from Dr. Araneda.[6] (Doc. 117 at 32.) Defendant Showalter responded on June 25, 2012, stating, "Dr. Araneda did not have your consult information because it was being reviewed. You have been referred to physical therapy and when scheduled you will be taken out. The consult was written and approved." (*Id*.)

On June 28, 2012, Plaintiff filed Grievance No. 418059, complaining about the denial of a brace for his hand and making general complaints about the medical care he was receiving from medical staff, specifically Dr. Araneda. (Doc. 116 at 115-16.) Grievance Coordinator Green received the grievance on July 2, 2012, and directed a Captain Walters to respond to it by July 24, 2012. (*Id*. at 115, 117.) Captain Walters denied the grievance on July 11, 2012, stating, "you have the proper splint on for your injury and I have found no merit to your complaint."

---

[6] It is not immediately clear whether this inmate request relates to any subsequently submitted grievances, as there is no discernable order to the grievance paperwork filed on the record by Defendants.

(*Id*. at 118.) Plaintiff appealed this decision to SOIGA on July 13, 2012, asserting,

*inter alia*,

> I am filing this grievance, as well as the others that has been filed, [for] fail[ure] to proper medicare [sic] and cruel and unusual. In which Dr. Luis O. Araneda and the medical staff along with Capt. Harris of Security here at SCI-Huntingdon has violated my Eighth Amendment rights and the PLRA. . . . In which SCI-Huntingdon medical staff denied me surgery for three weeks on my broken left thumb. Because of the length and time wasted the orthopedic specialist had to rebrake my left [wrist] and put two permanent screws in my hand. I was being denied a brace for my hand after the removal of my cast 6-18-12. A brace was sent here at SCI-Huntingdon and Capt. Harris denied the brace. . . . I am now being denied therapy. What was a temporary injury is now a permanent injury in which I have two permanent screws in my left hand. I now have to suffer with arthritis for the rest of my life because of the nefarious and atrocity of the staff here at SCI-Huntingdon. Also this situation has brought a high amount of stress mentally and [physically] because of the reduction of my livelihood [failure] of the proper medical treatment here at SCI-Huntingdon. . . . I was giv[en] a brace on 7-6-12 which I was told by Nurse Price that I will get the proper brace upon my release from the RHU.

(Doc. 117 at 36-37.) Grievance Officer Keri Moore responded to Plaintiff's appeal

on July 17, 2012, stating that SOIGA could not take any further action on the

appeal because "You must await the initial review response prior to proceeding

with this grievance." (*Id*. at 41.) On August 13, 2012, Grievance Officer Moore

further responded that final review of Plaintiff's appeal would not be granted until

Plaintiff appeals the issue to the Facility Manager. (Doc. 116 at 119.) According

to the Automated Inmate Grievance Tracking System, there is no record that

Plaintiff appealed this grievance per SOIGA's directives. (Doc. 115 ¶ 28; Doc. 117 at 35.)

On June 29, 2012, Plaintiff submitted two (2) inmate requests to Deputy Superintendent Eckard and Superintendent Bickell, regarding denial of a brace for his left hand.[7] (Docs. 117 at 28, 29.) Superintendent Bickell responded to the first request on July 2, 2012, stating, "There is an appt set up for you to go and get your brace." (*Id*. at 29.) Deputy Superintendent Eckard responded on July 5, 2012, stating,

> I subsequently checked into your noted concern with Medical Department. You were referred to Physical Therapy to be *evaluated* regarding a brace order, which my understanding is that you were to be evaluated and not actually to be ordered a brace. Due to a misunderstanding, a brace was attempted to be issued to you, which was denied by Security due to security concerns in the make/material of this brace. The Medical Department also advised me that you are presently awaiting an evaluation by physical therapy to determine IF you need a brace and if you do – what specific kind is needed.

(*Id*. at 27.)

On July 2, 2012, Plaintiff filed Grievance No. 418314, complaining that Captain Harris from the RHU denied him a brace issued to him for use before and during his physical therapy. (Doc. 117 at 30-31.) On July 3, 2012, Grievance Coordinator Green rejected the grievance as duplicative of Grievance No. 418059. (*Id*. at 16.) Plaintiff appealed on July 6, 2012, (Doc. 116 at 112-13), and

---

[7] As with Plaintiff's June 25, 2012, inmate request, *see supra*, note 6, at 28, it is not clear whether these requests relate to any subsequently filed grievances.

Superintendent Bickell upheld the rejected grievance on July 13, 2012, as duplicative of Grievance No. 418059, (Doc. 117 at 17). Plaintiff appealed the Superintendent's decision to SOIGA on July 13, 2012. (*Id*. at 23-24.) Grievance Officer Moore of SOIGA initially responded on August 7, 2012, informing Plaintiff that the action could not proceed to final review until he submitted the initial review response/rejection by the Grievance Officer and a legible copy of his appeal to the Facility Manager, signed and dated. (*Id*. at 22.) It appears that Plaintiff attempted to obtain free photocopies of the appropriate paperwork at SCI-Huntingdon, but his cash slip for those copies was denied, as he did not qualify as indigent. (*Id*. at 22.) Plaintiff subsequently sought an extension of time to file his appeal, (*id*. at 20), which was denied on September 20, 2012, (*id*. at 19). On October 18, 2012, SOIGA dismissed Grievance No. 418314 as duplicative of Grievance No. 418059. (*Id*. at 15.)

On July 18, 2012, Plaintiff filed Grievance No. 420612, complaining about the medical care for his left thumb injury. (Doc. 116 at 120.) More specifically, Plaintiff complained that Dr. Araneda rejected an outside specialist's orders for physical therapy and, instead, told Plaintiff to use a ball and squeeze it or, in the alternative, use a washcloth for the same effect. (*Id*.) On July 24, 2012, Defendant Showalter denied the grievance, stating,

Your grievance dated 7/18/12 has been received and investigated. You complain that you are not receiving appropriate care (physical therapy) for your thumb.

Review of your medical record indicates that you were seen on 7/6/12 by Occupational Therapy at Health South. On the written note returned with your consult, she notes that you "will benefit from therapy." As per this note, Dr. Araneda did write for in house physical therapy which was appropriate. Recommendations from a specialist are just that, it is up to the practitioner at the site to order what is needed. Dr. Araneda was following what the therapist wrote on your consult. We received the packet from her 7/19/12 (which is within the time frame allotted for reports from specialists) that gave us the prescription for therapy. Your therapy is being scheduled.

On the 17th, Mr. Lynch was informing the doctor of options we have available and using a washcloth to squeeze would give you same effect as a ball. The consult for in house physical therapy had already been written before this sick call visit.

This grievance is without merit and is denied. No monies will be awarded via this grievance.

(*Id*. at 121.) Plaintiff appealed this denial on July 27, 2012. (*Id*. at 122.) On

August 7, 2012, Superintendent Bickell upheld the denial, reasoning,

In reviewing your grievance and appeal, I note that your concern with physical therapy was appropriately addressed by Ms. Showalter. In your appeal, you repeat the complaint that was presented in your initial grievance. You go on to complain that you were told you would be doing in-house therapy instead of traveling to HealthSouth in State College for therapy. As Ms. Showalter explains in her response to your initial grievance, physical therapy was recommended, and as a result, Dr. Araneda wrote an order for in-house physical therapy which was appropriate. Until your therapy could begin, Mr. Lynch suggested squeezing a washcloth which would give the same effect as squeezing a ball. I discussed this course of treatment with Ms. Showalter and found that you were scheduled for physical therapy; however, you were taken for a follow up visit

> with the orthopedic specialist who discontinued the physical therapy and discontinued your brace because he found your thumb had healed properly. I find you have not been denied proper medical care for your injured thumb.
>
> In closing, I can only reiterate that I uphold the response provided by the grievance officer. Your grievance is found to be without merit.

(*Id*. at 124.) There is no record of Plaintiff's appealing this decision to SOIGA.

On July 19, 2012, Plaintiff filed Grievance No. 420876, complaining about a delay in his physical therapy and denial of a brace for his left hand. (*Id*. at 125.) On July 23, 2012, Grievance Coordinator Green rejected the grievance as duplicative of Grievance No. 420612. (*Id*. at 126.) On July 26, 2012, Plaintiff appealed this decision to Superintendent Bickell, (*id*. at 127-28), who upheld the rejection on August 7, 2012, (*id*. at 129). There is no record of Plaintiff appealing this decision to SOIGA.

### 3. **Procedural History**

Plaintiff initiated this action with a complaint filed on September 30, 2013. (Doc. 1.) By order dated October 7, 2013, the court directed service of the complaint on all Defendants named therein. (Doc. 7.) On December 9, 2013, Corrections Defendants filed a motion to dismiss the complaint and supporting brief. (Docs. 16 & 17.) On December 16, 2013, Medical Defendants also filed a motion to dismiss the complaint and supporting brief. (Docs. 20 & 21.) After those motions were ripe for disposition, on September 30, 2014, the court issued a

memorandum and order granting in part and denying in part both motions. (Docs. 52 & 53.) Specifically, the Eighth Amendment claim of deliberate indifference to Plaintiff's serious medical needs survived as to Defendants Dunkle, Showalter, and Parkes. (*See* Doc. 53.) Further, Plaintiff's retaliation claim against Defendant Showalter survived. (*Id.*) The additional claims and Defendants were dismissed, and the remaining Defendants were directed to answer Plaintiff's complaint. (*Id.*)

After both sets of Defendants answered the complaint, (*see* Doc. 57 & 58), Plaintiff filed a motion for the appointment of counsel. (Doc. 59.) On November 19, 2014, the court granted Plaintiff's motion, provided that a member of the *Pro Bono* panel of the Middle District of Pennsylvania Chapter of the Federal Bar Association agree to volunteer to represent Plaintiff. (Doc. 61.) Plaintiff was also advised that, if the court was unable to locate counsel to represent him, he would be required to proceed *pro se*. (*Id.*)

On June 23, 2015, the court informed Plaintiff that it had not received a reply from the *Pro Bono* panel and, therefore, Plaintiff was granted leave to proceed *pro se*. (Doc. 69; *see also* Doc. 71.) On August 3, 2015, the court issued a scheduling order, setting deadlines for discovery and dispositive motions. (Doc. 72.) However, attempts to deliver these court orders to Plaintiff were unsuccessful. (*See* Docs. 73-76.) As a result, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, on September 23, 2015, the court issued an order dismissing Plaintiff's

complaint for failure to prosecute, and directing the Clerk of Court to close the case. (Doc. 77.) Notably, this court order sent to Plaintiff was also returned as undeliverable. (Doc. 78.)

On November 18, 2015, Plaintiff filed a notice of change of address, noting his new address at the Dauphin County Prison. (Doc. 79.) Subsequently, the court directed the Clerk of Court to send the formerly undelivered court orders to Plaintiff at his new address. (Doc. 80.) Thereafter, Plaintiff filed a response to the order closing his case, explaining that he had been injured and unable to communicate with the court. (Doc. 82.) On April 27, 2016, the court granted Plaintiff leave to file a motion for reconsideration of the order dismissing his complaint and closing the case. (Doc. 86.) Plaintiff filed a motion for reconsideration on May 5, 2016, (Doc. 87), which was granted by order dated July 14, 2016, (Doc. 93). In the order granting reconsideration and reopening the case, the court also set forth new scheduling deadlines. (Doc. 93.)

On September 29, 2016, Medical Defendant Parkes filed a motion for summary judgment. (Doc. 107.) Corrections Defendants filed a motion for summary judgment on October 6, 2016. (Doc. 113.) On October 19, 2016, Plaintiff filed a motion for cross summary judgment. (Doc. 122.) All motions are now ripe for disposition.

## II.    **Standard of Review**

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for granting a motion for summary judgment. Rule 56(a) provides, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party," and draw all reasonable inferences in favor of the same. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005), *cert. denied*, 546 U.S. 1094 (2006).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving

party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.  Discussion

A plaintiff, in order to state a viable § 1983 claim, must plead two essential elements: 1) that the conduct complained of was committed by a person acting under color of state law, and 2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution and laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988).  A defendant's conduct must have a close causal connection to plaintiff's injury in order for § 1983 liability to attach.

*Martinez v. California*, 444 U.S. 277, 285 (1980).[8]  A prerequisite for a viable civil rights claim is that a defendant directed, or knew of and acquiesced in, the deprivation of a plaintiff's constitutional rights.  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988).  On its face, § 1983 creates no exceptions to the liability it imposes, nor does it speak of immunity for any individual who might deprive another of civil rights.  *See Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993).  Nevertheless, it is well-settled that certain government officials possess immunity from § 1983 liability.  *Id.*

As stated above, there are two motions for summary judgment and one motion for cross summary judgment pending in the instant case.  In the Corrections Defendants' motion, they argue that summary judgment should be granted in their favor on the following grounds: (1) Plaintiff failed to exhaust his available administrative remedies relating to his allegations of denial of medical care and/or painkillers; (2) the record reflects that Defendants were not deliberately indifferent to Plaintiff's serious medical needs; and (3) the record shows that Defendant Showalter did not retaliate against Plaintiff for submitting verbal and written complaints about her.  Medical Defendant Parkes argues that summary judgment should be granted in her favor because there is no evidence to support Plaintiff's

---

[8] The Court in *Martinez* explained: "Although a § 1983 claim has been described as 'a species of tort liability,' *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S. Ct. 984, 988, 47 L. Ed. 2d. 128 [(1976)], it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute." *Martinez*, 444 U.S. at 285.

claim that she was deliberately indifferent to his serious medical needs. And finally, Plaintiff argues in his motion for cross summary judgment that summary judgment should be entered in his favor because: (1) all remaining Defendants delayed and/or denied him proper medical treatment for his injuries; and (2) Corrections Defendant Showalter retaliated against him for verbal and written complaints he made about her. As exhaustion is a threshold issue, the court will first address Corrections Defendants' argument with respect to exhaustion of available administrative remedies before addressing the remaining arguments.

## A. Exhaustion of Administrative Remedies

DOC Defendants argue that Plaintiff's claims related to medical treatment for his injuries should be dismissed based on Plaintiff's failure to exhaust his administrative remedies, as required by the Prison Litigation Reform Act of 1995 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996).

The PLRA requires a prisoner to present his claims through an administrative grievance process before seeking redress in federal court. The act specifically provides as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular

episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). A prisoner must exhaust all available administrative remedies before initiating a federal lawsuit. *Booth v. Churner*, 532 U.S. 731, 739 (2001). Failure to exhaust available administrative remedies is an affirmative defense. *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002). As such, the failure to exhaust available administrative remedies must be pleaded and proven by the Defendants. *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002).

The Pennsylvania DOC has an Inmate Grievance System which permits any inmate to seek review of problems that may arise during the course of confinement. 37 Pa. Code § 93.9(a); *see also* www.cor.state.pa.us, DOC Policies, Policy No. DC-ADM 804, Inmate Grievance System. After an attempt to resolve any problems informally, an inmate may submit a written grievance to the facility's Grievance Coordinator for initial review. An inmate may then appeal an adverse decision of the Grievance Coordinator to the Superintendent of the institution, and can finally appeal to the Secretary of the DOC Office of Inmate Grievances and Appeals ("SOIGA"). *See Booth v. Churner*, 206 F.3d 289, 293 n.2 (3d Cir. 2000) (outlining Pennsylvania's grievance review process).

Courts within the Third Circuit and the Middle District have consistently imposed a procedural default component on the exhaustion requirement that requires inmates to "fully satisfy the administrative requirements of the inmate

grievance process before proceeding into federal court." *McClintic v. Bickell*, No. 1:14-CV-2005, 2015 WL 4207229, at *3 (M.D. Pa. July 10, 2015) (citing *Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004)). "Inmates who fail to fully, or timely, complete the prison grievance process, or who fail to identify the named defendants, are barred from subsequently litigating claims in federal court." *Id.* at *3 (citing *Spruill*, 372 F.3d 218). Indeed, an "untimely or otherwise procedurally defective administrative grievance" fails to satisfy the exhaustion requirement of the PLRA and the failure to properly "exhaust administrative remedies" is a bar to "filing suit in federal court." *Woodward v. Ngo*, 548 U.S. 81, 83-84, 92 (2006). However, the particularity of the administrative complaint is judged only by the prison grievance process itself, which will vary from system to system and claim to claim. *Jones v. Bock*, 549 U.S. 199, 218 (2007); *see also Moore v. Bennette*, 517 F.3d 717, 726 (4th Cir. 2008) (vacating a lower court's decision to dismiss a claim for failing to "identify specific individuals in his grievances" where the grievance policy did "not require identification of the persons responsible for the challenged conduct."). Because "early notice to those who might later be sued . . . has not been thought to be one of the leading purposes of the exhaustion requirement," the named defendants in the administrative complaint have no bearing on the sufficiency of the district court complaint, as long as the administrative complaint was proper in its own right. *Jones*, 549 U.S. at 201.

In the present case, Corrections Defendants argue that summary judgment should be entered in their favor as to the claims of denial of medical care and/or painkillers because Plaintiff either did not properly and fully exhaust the three (3) relevant available administrative remedies or he failed to name the Defendants in those grievances. Medical Defendant Parkes makes no argument with respect to exhaustion of available administrative remedies. The court will discuss the grievances Corrections Defendants refer to separately.

### 1. Grievance No. 416313

On June 15, 2012, Plaintiff filed Grievance No. 416313, complaining about the treatment he was receiving for his left hand and thumb injuries. Defendant Showalter denied the grievance on June 19, 2012. Plaintiff appealed, and on August 10, 2012, the grievance was dismissed by SOIGA on final review for Plaintiff's failure to provide the required documentation for proper review.

Further, in this Grievance, Plaintiff does not mention either Defendant Showalter or Dunkle. Rather, he only refers to Dr. Araneda and a "Nurse Holly." In fact, at his deposition, Plaintiff admitted that, in this grievance, he was not complaining about anything that Defendant Showalter or Dunkle did. (Doc. 116 at 46-47.)

In a supplement to his counter statement of material facts and brief in opposition, Plaintiff responds to Corrections Defendants' argument with respect to

exhaustion of available administrative remedies. (Doc. 126.) However, Plaintiff makes no argument to excuse exhaustion as to this Grievance. (*See id*. at 2.)

In light of the evidence on record in this case, as well as Plaintiff's admission that, in this Grievance No. 416313, he was not complaining about the conduct of either Defendant Showalter or Dunkle, the court finds that Plaintiff did not properly and fully exhaust his administrative remedies with respect to a denial of medical care and/or painkillers, through this Grievance.

## 2. Grievance Nos. 418059 / 418314

On June 28, 2012, Plaintiff filed Grievance No. 418059, complaining about the denial of a brace for his hand and making general complaints about the medical care he was receiving from medical staff. Captain Walters denied the grievance on July 11, 2012. Plaintiff appealed, and on July 17, 2012, SOIGA initially responded to Plaintiff that it could not take further action until the initial review response process had concluded. On August 13, 2012, SOIGA further responded that final review of Plaintiff's appeal would not be granted until Plaintiff appealed the issue to the Facility Manager. The record indicates that Plaintiff did not complete the appeal process per SOIGA's directives.

On July 2, 2012, Plaintiff filed Grievance No. 418314, complaining that Captain Harris from the RHU denied him a brace for his left hand. On July 3, 2012, a Grievance Coordinator rejected the grievance as duplicative of Grievance

No. 418059.  Plaintiff appealed, and on August 7, 2012, SOIGA initially responded that the action could not proceed to final review until Plaintiff submitted the proper documentation.  Plaintiff sought an extension of time while he tried to obtain free photocopies of the appropriate paperwork, but the extension was denied on September 20, 2012.  Further, SOIGA dismissed the grievance on October 18, 2012, as duplicative of Grievance No. 418059, and provided no substantive decision on appeal.

In the supplement to his counter statement of material facts and brief in opposition, Plaintiff seeks to excuse exhaustion of available administrative remedies with respect to Grievance No. 418314 (and presumably Grievance No. 418059), by stating that, due to prison officials' failure to recognize his indigence, he was unable to provide SOIGA with the proper documentation needed for final review.  (Doc. 126 at 2.)  He claims that he was unable to make photocopies or obtain postage to send his appeal to SOIGA.  (*Id*.)  While he does not explicitly connect this to an access to the courts claim, Plaintiff appears to be claiming that because he could not file timely appeals, he would have failed to properly exhaust under the PLRA, s*ee Woodford*, 548 U.S. at 93, and thus could not bring his federal claims in court.  However, the problem with such an argument is that Plaintiff's grievances were not rejected as untimely.  First, it does not appear that Plaintiff attempted to make photocopies for the appeal of Grievance No. 418059,

nor did he even file an appeal. Further, while Plaintiff did seek an extension of time to file an appeal to the rejection of Grievance No. 418314, that extension was denied and, later, the grievance was dismissed as duplicative of Grievance No. 418059. Thus, in neither case was an appeal dismissed as untimely. Notably, if Plaintiff could show that prison authorities prevented him from timely filing, then he would be able to proceed here based on *Brown v. Croak*, 312 F.3d 109 (3d Cir. 2002) (holding that an administrative remedy is not "available" under the PLRA where prison authorities thwart a prisoner's efforts to exhaust administrative remedies). Simply denying Plaintiff's request for free photocopies because he is not indigent does not qualify as obstruction by prison authorities. Thus, the court finds that Plaintiff did not properly and fully exhaust his administrative remedies with respect to a denial of medical care through these Grievances.

### B. <u>Deliberate Indifference Claims</u>

In both their motions for summary judgment, Corrections Defendants and Defendant Parkes argue that Plaintiff has failed to establish that they were deliberately indifferent to Plaintiff's serious medical needs with respect to addressing Plaintiff's left hand and thumb injuries. A Section 1983 claim based on a violation of the Eighth Amendment's prohibition of unnecessary and wanton infliction of pain arises where prison officials or doctors exhibit deliberate indifference to serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97,

104 (1976).  A deliberate indifference claim has two components: an objective component under which the plaintiff must show that denial of care itself was serious or that it had serious consequences; and a subjective component under which the plaintiff must show that the defendant has a sufficiently culpable state of mind.  *See Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002).  Further, a serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Mines v. Levi*, 2009 WL 8390011, at *7 (E.D. Pa. Mar. 26, 2009) (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d at 1017, 1023 (3d Cir. 1991)); *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).  "[I]f unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the Eighth Amendment."  *Young v. Kazmerski*, 226 F. App'x 191, 193 (3d Cir. 2008) (quoting *Lanzaro*, 834 F.2d at 347).

Deliberate indifference occurs where a defendant: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; (3) prevents a prisoner from receiving needed or recommended medical treatment; or (4) persists in a particular course of treatment "in the face of resultant pain and risk of

permanent injury." *Rouse v. Allen*, 182 F.3d 192, 197 (3d Cir. 1999). However, "claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" *Id*. (citing *Estelle*, 429 U.S. at 105); *see also Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) (finding that if inadequate treatment results simply from an error in medical judgment, there is no constitutional violation); *Lanzaro*, 834 F.2d at 346 (stating mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim). In *Estelle*, the Supreme Court held the following:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

*Estelle*, 429 U.S. at 105-06.

It follows then that inconsistencies or differences in medical diagnoses, short delays unaccompanied by arbitrary or unduly burdensome bureaucratic procedures, and the refusal to summon the medical specialist of the inmate's choice, perform tests or procedures that the inmate desires, or to explain to the inmate the reason for medical action or inaction does not amount to cruel and unusual punishment. *Runkle*, 2013 WL 6485344, at * 8 (citing *Maqbool v. Univ. Hosp. of Medicine & Dentistry of New Jersey*, Civ. No. 11-4592, 2012 WL

2374689, at * 9 (D. N.J. Jun. 13, 2012)).  As such, allegations that the inmate was provided with medical care, but the care was "inadequate," fails to state a cognizable claim.  *Runkle*, 2013 WL 6485344, at *8 (citing *Taylor v. Visinsky*, 422 F. App'x 76, 78 (3d Cir.), *cert. denied*, 565 U.S. 947 (2011)).  *See also Jetter v. Beard*, 130 F. App'x 523, 526 (3d Cir. 2005) (noting that while the plaintiff would have preferred a different course of treatment, his preference does not establish an Eighth Amendment cause of action).  Rather, "the decision whether to summon a doctor, like the question of whether a certain diagnostic technique or form of treatment should be prescribed, 'is a classic example of a matter for medical judgment.'"  *McNeil v. Redman*, 21 F. Supp. 2d 884, 887 (C.D. Ill. 1998) (quoting *Estelle*, 429 U.S. at 107).   Accordingly, the deliberate indifference test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients.  Courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment.'"  *Little v. Lycoming County*, 912 F. Supp. 809, 815 (M.D. Pa. 1996) (citing *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979), quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

Further, a non-medical prison official is not deliberately indifferent simply because he or she failed to respond to a prisoner's medical complaints when

a doctor was already treating the prisoner. *Durmer*, 991 F.2d at 69. "Absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical [prison official] . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Spruill*, 372 F.3d at 236. "[T]he same division of labor concerns that underlie that rule apply when a nurse knows that a prisoner is under a physician's care and has no reason to believe that the doctor is mistreating the prisoner." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 540 n.4 (3d Cir. 2017). "Given that it is the physician with the ultimate authority to diagnose and prescribe treatment for the prisoner, a nurse who knows that the prisoner is under a physician's care is certainly 'justified in believing that the prisoner is in capable hands,' *id*. so long as the nurse has no discernable basis to question the physician's medical judgment." *Id*. (quoting *Spruill*, 372 F.3d at 236.).

In the instant case, Plaintiff claims that the remaining Defendants were responsible for the delays in medical treatment for his left hand and thumb injuries.[9] The court will discuss the delays as they relate to the appropriate Defendants as follows:

---

[9] In the court's September 30, 2014 memorandum and order addressing two motions to dismiss, the court dismissed Plaintiff's claims that he was denied physical therapy and a brace for his injuries. (*See* Docs. 52 & 53.) Therefore, what remains here on summary judgment with respect to inadequate medical care claims are Plaintiff's claims of delays in his treatment.

## 1. **Delay in Initial Medical Treatment**

Plaintiff claims that Corrections Defendant Dunkle caused a three-day delay in his initial medical treatment once he entered the RHU after the April 17, 2012 fight.[10]  Specifically, Plaintiff claims that Defendant Dunkle denied him treatment because Plaintiff had engaged in a fight with one of Defendant Dunkle's informants.  (Doc. 1 at 3.)  This denial in treatment for non-medical reasons resulted in Plaintiff remaining in unnecessary pain for his untreated injuries until three days later, or April 20, 2012.

Based on the record before the court on summary judgment, the court concludes that Plaintiff has failed to establish that Defendant Dunkle was deliberately indifferent to his serious medical needs in this instance.  The record reflects that, upon Plaintiff's arrival at the RHU, Defendant Dunkle followed proper procedures in processing Plaintiff's entry into the unit.  He noted Plaintiff's injuries to his left hand and thumb, and took photographs of those injuries.  In addition, he completed in part the Suicide Risk Indicators Checklist for Plaintiff. Because Defendant Dunkle is not a medical provider, he did not directly provide medical care to Plaintiff.  Rather, a Nurse Wagman entered a note in Plaintiff's medical record on April 17, 2012, stating, "No injuries noted or voiced.  [Plaintiff] stated, 'I'm okay.' P[resciption:] sick call as needed."  (Doc. 118 at 61.)  That

---

[10] No other Defendants are implicated in this claim.  (*See* Doc. 52 at 23 n.5.)

medical chart from April 17, 2012 was reviewed by another nurse that night.[11]

Further, two days later, on April 19, 2012, Plaintiff was seen in the RHU during

sick call by Dr. Dayan. The doctor ordered x-rays and prescribed Tylenol. (Doc.

118 at 79.) While Plaintiff denies he was seen on April 19, 2012, he does not

dispute that he was seen and treated on April 20, 2012.

In short, even accepting Plaintiff's assertion that the delay in initial

treatment was three (3) days, the court cannot say this delay was caused by

Defendant Dunkle or that such a delay rises to the level of deliberate indifference.

The record demonstrates that medical staff was aware of Plaintiff's injuries once

he was processed into the RHU and that medical attention was paid to those

injuries. Given the medical staff's awareness of Plaintiff's injuries, the court fails

to see how Defendant Dunkle, himself not a medical provider, could have delayed

a treatment plan that was underway. There is nothing in the record to suggest that

Defendant Dunkle prevented medical personnel from entering the RHU, from

conducting sick call, or from evaluating Plaintiff during those initial three (3) days.

Even if Defendant Dunkle directed Plaintiff to sit in his cell in the RHU, an act

Plaintiff was required to do anyway by virtue of his intake into the unit, there is

nothing in the record indicating that Defendant Dunkle deliberately or intentionally

_____

[11] Again, Plaintiff denies that Nurse Wagman was present for his intake into the RHU, which
took place at a strip-search cell in the unit. While that may be the case, there is nothing in the
record to suggest that Nurse Wagman did not evaluate Plaintiff in the RHU that day following
Plaintiff's intake conducted at the strip-search cell in the RHU.

prevented medical staff, who enter and treat inmates in the RHU, from evaluating Plaintiff. Rather, this is clearly a case where Plaintiff has been given medical attention and is dissatisfied with the course of treatment and subsequent results. An inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. *Durmer*, 991 F.2d at 69; *Spruill*, 372 F.3d at 235. Thus, Plaintiff's claim here will be denied and summary judgment will be granted in favor of Defendant Dunkle.

### 2. Delay in Requesting and/or Scheduling Medical Treatment

Plaintiff claims that Defendants Showalter and Parkes were deliberately indifferent to his serious medical needs when they intentionally delayed requesting and/or scheduling medical treatment on behalf of Plaintiff. In support of this claim, Plaintiff asserts that, after his Friday, April 20, 2012 visit to Altoona Regional Hospital's ER, doctors there recommended immediate emergency surgery to his left thumb for the following Monday, April 23, 2012. Plaintiff claims that both Defendants Showalter and Parkes knew of the need to schedule this April 23, 2012 appointment, but failed to do so. Plaintiff also asserts that he continued to inform these Defendants of his pain and suffering in the following weeks, but neither took any steps to schedule appropriate medical appointments. As a result, Plaintiff's first surgery was delayed until May 11, 2012, and his second surgery to remove the razor blade was delayed until September 7, 2012. Finally,

Plaintiff also claims that Defendant Showalter refused to provide him with pain medication during all relevant times.

Based on the record before the court on summary judgment, the court concludes that Plaintiff has failed to establish that Defendants Showalter and Parkes were deliberately indifferent to his serious medical needs with respect to any delay in his treatment. In analyzing Plaintiff's claim, it is important to set forth the duties of both Defendants Showalter and Parkes. As to Defendant Showalter, it is noted that, as the CHCA, her duties ranged from overseeing the health care services program to coordinating cooperation between prison medical staff and Corizon, the contracted medical vendor. Even though Defendant Showalter is a licensed RN, in her capacity as the CHCA, she could not prescribe medication, including painkillers, to inmates.

Defendant Showalter also answered inmate grievances regarding their medical treatment. In order to do so, she normally would review an inmate's medical records. If an inmate grievance or request slip concerned a consultation with an outside doctor, Defendant Showalter would also normally contact the contracted medical vendor, Corizon, about the inmate's concerns.

If an inmate was taken to a local Emergency Room, any instructions from the ER doctor would be sent to Corizon, and not to Defendant Showalter. If Corizon initiated or scheduled a consultation, Defendant Showalter would monitor

such consultations, but she would not have been aware of any consultations not initiated or scheduled by Corizon. Specifically, Defendant Showalter did not order outside consultations or surgeries. Further, as the CHCA, she could not override decisions of medical doctors, such as what medications to prescribe or whether to order outside consultations or physical therapy.

Turning to Defendant Parkes, at the relevant time, she held the position of clinical coordinator at SCI-Huntingdon, but was an employee of Corizon. In her position as clinical coordinator, Defendant Parkes did not provide medical care to inmates, and indeed, had no personal contact with Plaintiff for the provision of medical services. Rather, her duties included scheduling appointments with outside medical professionals when directed to do so by medical staff at the prison. It is the prison's medical personnel who determine the reason for an inmate to be transferred to an outside medical provider.

Further, Defendant Parkes had no control over when an inmate will be seen by a medical provider outside the prison. The date of an appointment is determined by the outside medical provider based upon availability. Once an appointment date is secured, prison officials are notified through the distribution of a "trip sheet" so that arrangements can be made to transport the inmate to the location of the outside medical provider. Defendant Parkes did not control the

availability of prison officials to transport an inmate to a scheduled outside appointment.

In his complaint and subsequent filings relating to the instant motions, Plaintiff displays a general misunderstanding of the duties of these Defendants. In fact, Plaintiff assigns authority to both Defendants with respect to his medical treatment that is misplaced. Notably, Plaintiff has provided no support, documentary or otherwise, for his blanket statements regarding what these Defendants were able to provide for him medically. Instead, from the record, it is clear that the duties of these Defendants were purely administrative and neither had the independent ability to direct or control the medical care provided to Plaintiff. Importantly, this includes securing appointments for Plaintiff's surgeries and other treatment, most notably the April 23, 2012 appointment to which Plaintiff refers.[12]

---

[12] Plaintiff claims that at the April 20, 2012 appointment with Dr. Stauff, the doctor recommended that Plaintiff return on April 23, 2012 for surgery. (Doc. 125-1, Ex. 1, Pl. Decl.) According to Plaintiff, the doctor asked the Corrections Officers escorting Plaintiff that day to whom should he send the request, and a CO Duccassi responded: Traci Parkes, because she handles "all" arrangements and appointments. (*Id*. at 3.) Dr. Stauff then wrote the recommendation on a piece of purple note paper and attached it to the medical record. (*Id*. at 4.) When Plaintiff saw CO Duccassi on Monday, April 23, the CO told him that he was not on the list for transport to the hospital that day. (*Id*.) Plaintiff asked Defendant Showalter about the appointment, and she responded that he would be seeing a doctor soon. (*Id*.)

There is nothing in Plaintiff's medical records indicating that Dr. Stauff recommended an April 23, 2012, appointment. In fact, from the medical records submitted by both Plaintiff and Corrections Defendants, it appears that Plaintiff first saw Dr. Stauff at the University Orthopedics Center in State College on May 10, 2012. The medical records from Plaintiff's April 20, 2012 ER visit at the Altoona Regional Hospital do not indicate Dr. Stauff was present and evaluated Plaintiff at that time. However, as neither set of Defendants dispute whether Dr. Stauff conducted the April 20, 2012, evaluation, the court will not make a further issue of it here.

Patients, both inmates and non-inmates, generally have to obtain referrals and appointments to see medical professionals, especially for treatments such as surgery. In Plaintiff's case, it was the outside medical providers who conveyed to Corizon the need for treatment. From there, according to the record in this case, a Corizon medical professional at the prison would have to authorize an appointment. A coordinated effort between those providers and administrators, in this case Defendant Parkes, was clearly made to schedule Plaintiff's appointments.

As to Plaintiff's first surgery, the record shows that an orthopedic consultation was submitted on April 21, 2012, by a prison medical staff member. (Doc. 115 ¶ 64.) He was seen by a nurse in the RHU on April 24, 2012, for complaints of pain in his left hand, and later that day was prescribed pain medication. (*Id*.) Further, another note in the record reflects that by April 29, 2012, an orthopedic appointment had been scheduled. (*Id*. ¶ 65.) Plaintiff was also seen by prison medical staff, who evaluated him and prescribed pain medications, on April 30, 2012 (*id*. ¶ 65), May 3, 2012 (*id*. ¶ 66), May 4, 2012 (*id*.), and May 9, 2012 (*id*. ¶ 67). And it was on May 10, 2012, that Plaintiff was finally transported to an outside doctor for evaluation. (*Id*.) Dr. Lincoski performed the first surgery the next day, May 11, 2012. (*Id*.)

As to Plaintiff's second surgery, the record is not entirely clear why Dr. Lincoski did not perform this surgery until September 7, 2012. Nevertheless, the

record is clear that, between Plaintiff's two surgeries, he received extensive

medical care, by both prison medical providers and outsider providers. Dr. Dayan

and Dr. Araneda, along with several nurses and PAs, evaluated Plaintiff on

multiple occasions in the RHU. (*See* Doc. 115 ¶¶ 68-78.) Physical therapy and

pain medications were prescribed, monitored, and in some instances, cancelled.

(*Id.*) Plaintiff had outside consultations with Dr. Lincoski on July 26, 2012 (*id.* ¶

76), and August 23, 2012, (*id.* ¶ 78). But Plaintiff did not have his second surgery

until September 7, 2012. (*Id.* ¶ 79.)

Plaintiff takes issue with the timing of these surgeries. He may think that

he should have been referred to a surgeon for surgery sooner than he was, but

Plaintiff's disagreement with the protocol taken does not rise to the level of

deliberate indifference. A prisoner administrator cannot be found deliberately

indifferent under the Eighth Amendment because he or she fails to respond to the

medical complaints of an inmate being treated by a prison physician or, because, as

a non-physician, he or she defers to the medical judgment of the inmate's treating

physicians. *Durmer*, 991 F.2d at 69.

The court notes that if, however, non-medical prison personnel had "a

reason to believe (or actual knowledge) that prison doctors or their assistants are

mistreating (or not treating) a prisoner," liability may be imposed. *Spruill*, 372

F.3d at 236. This is simply not the case here. The medical record, as summarized

above, shows that the prison medical staff responded quickly and thoroughly to Plaintiff's medical needs for his left hand and thumb injuries. He was taken to several outside appointments to be seen by various medical professionals, including ER doctors and orthopedic surgeons, and given appropriate treatment. He was prescribed pain medications to alleviate his suffering. Unfortunately for Plaintiff he remained in pain despite the efforts of his medical team. But, again, Plaintiff's disagreement with his treatment fails to establish deliberate indifference. Absent a showing that the medical report is inaccurate and that the described course of treatment did not occur, Plaintiff's claims as to the delay in treatment and a refusal to provide pain medication fail.

In sum, while Plaintiff is not in agreement with the medical decisions made, the record before the court clearly demonstrates that Plaintiff was receiving ongoing medical attention, both immediately after the fight and during the period of time it took to repair his left hand and thumb through two (2) surgeries. Staff treated and evaluated Plaintiff on sick call visits and scheduled appointments. Defendants Showalter and Parkes followed the written directives provided by outside providers to prison medical providers, relying on the professional judgment of those providers in coordinating orthopedic consultations and appointments. Accordingly, Plaintiff has failed to demonstrate that these Defendants possessed the culpable mental state necessary for Eighth Amendment liability to attach. As a

result, the deliberate indifference claims against Defendants Showalter and Parkes will be denied.

## C. **Retaliation Claim**

Plaintiff alleges that Corrections Defendant Showalter delayed his medical treatment in retaliation for his written and verbal complaints against her. Upon review, the court will grant summary judgment in favor of Defendant Showalter as to this claim.

In order to state a retaliation claim, a plaintiff must satisfy three elements. First, a plaintiff must prove the he was engaged in a constitutionally protected activity. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Second, an inmate plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials." *Id*. (quoting *Allah v. Seiverling*, 228 F.3d 220, 225 (3d Cir. 2000)). This requirement is satisfied by showing adverse action "'sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'" *Id*. at 333 (quoting *Allah*, 229 F.3d at 225). Third, a prisoner plaintiff must prove that "his constitutionally protected conduct was a 'substantial or motivating factor' in the decision to discipline him." *Id*. at 333 (quoting *Mount Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000).

Here, Plaintiff has not demonstrated that his filing of grievances was a substantial or motivating factor for any delay in his medical treatment by

Defendant Showalter. This is particularly true where the record reveals that, as the CHCA, Defendant Showalter did not order outside consultations or surgeries, nor could she override decisions of medical doctors, such as what medications to prescribe or whether to order outside consultations or physical therapy. While Defendant Showalter could monitor consultations initiated or scheduled by prison medical providers, she herself was not in charge of scheduling such consultations. Thus, any delay in Plaintiff's medical treatment simply cannot be attributed to Defendant Showalter. Consequently, Plaintiff's claim of retaliation against Defendant Showalter fails and summary judgment will be entered in favor of the Defendant.

## IV. <u>Conclusion</u>

For the reasons set forth above, Corrections Defendants' motion for summary judgment (Doc. 113) will be granted. In addition, Medical Defendant Parkes' motion for summary judgment (Doc. 107) will be granted. Plaintiff's motion for cross summary judgment (Doc. 122) will be denied. Judgment will be entered in favor of all Defendants and against Plaintiff.

An appropriate order will issue.

 s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated: September 28, 2017